UNITED STATES v. BARTRAM BROS. SAME v. BENJAMIN H. HOWELL,
SON & CO. SAME v. AMERICAN SUGAR REFINING CO.

(Circuit Court of Appeals, Second Circuit. June 2, 1904.)

Nos. 102–104 (2,918–2,920).

1. CUSTOMS DUTIES—SUGAR—POLARISCOPIC TEST—COMMERCIAL USAGE.
   In construing the provision in paragraph 209, Tariff Act July 24, 1897,
   c. 11, § 1, Schedule E, 30 Stat. 168 [U. S. Comp. St. 1901, p. 1647], regulat-
   ing duty on sugars according to the polariscopic test, *held* that the expres-
   sions therein, "testing by the polariscope" and "shown by the polariscopic
   test," are not used with any special trade meaning that would confine them
   to a particular method of conducting such test, but import an intention on
   the part of Congress that the method adopted should be the one best cal-
   culated to make a scientific determination.

2. SAME—CUSTOMS REGULATIONS—AUTHORITY OF SECRETARY OF THE TREASURY.
   Under the general power of the Secretary of the Treasury to make cus-
   toms regulations not inconsistent with law, granted by section 251, Rev. St.
   U. S. [U. S. Comp. St. 1901, p. 138], it is competent for that officer to pre-
   scribe the method of "testing by the polariscope" the sugars dutiable ac-
   cording to such test under paragraph 209, Tariff Act July 24, 1897, c. 11,
   § 1, Schedule E, 30 Stat. 168 [U. S. Comp. St. 1901, p. 1647]; and so long
   as he acts in good faith, and it does not appear that his regulations operate
   to make the polariscopic test less accurate than when Congress adopted it,
   the courts should not interfere with the administrative details confided to
   him.

3. SAME—TREASURY REGULATIONS—COGNIZANCE BY CONGRESS.
   Where, for a period of years covering the operation of several tariff acts,
   the Secretary of the Treasury has made regulations for carrying out cer-
   tain provisions in those acts, it is to be presumed that subsequent legisla-
   tion by Congress was enacted with reference to such regulations.

Appeals from the Circuit Court of the United States for the South-
ern District of New York.

For opinion below, see 123 Fed. 327.

These causes come here upon appeal from a decision of the Circuit
Court, Southern District of New York (123 Fed. 327), reversing a de-
cision of the Board of General Appraisers (G. A. 4,386, T. D. 20,850),
which affirmed the action of the collector of the port of New York in
assessing duty on certain sugars imported under the tariff act of July
24, 1897. Paragraph 209 of that act (chapter 11, § 1, Schedule E, 30
Stat. 168 [U. S. Comp. St. 1901, p. 1647]) provides as follows:

"209. Sugars not above number sixteen Dutch Standard in color, * * *
testing by the polariscope not above seventy-five degrees, ninety-five one-hun-
dredths of one cent per pound, and for every additional degree shown by the
polariscopic test, thirty-five one thousandths of one cent per pound, additional
and fractions of a degree in proportion."

Chas. Duane Baker, for appellant.

John E. Parsons, for appellees.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The opinions of the Board of General
Appraisers and of the Circuit Judge, respectively, present forcibly the
opposing theories of construction of the paragraph above quoted, and
set forth the facts with quite sufficient fullness. Although the record is

131 F.—53

a long one, there is but a single question presented, which is determinative of the case, viz., whether Congress used the words "testing by the polariscope" and "shown by the polariscopic test" with some special trade meaning, which would confine them to a particular method of conducting such test.

The following excerpts from the opinion of the Circuit Court and from that of the Board of General Appraisers show the particular matter complained of:

"The polariscope is an instrument so adjusted that when a ray of polarized light passes through a tube filled with a certain solution of sugar the scale indicates the percentage of pure sugar. * * * At the time of the passage of the act in question the polariscopic test had been in use for some twenty years." "During that period it was the custom of merchants, in buying and selling sugar, to have two separate polariscopic tests made, each by a trade chemist employed by the respective parties to the transaction. Where these two tests differed, a compromise or settlement test was adopted, which was the average of degrees shown by the two tests." "Under [this] system the actual readings of the scale on the eye piece of the polariscope were taken as showing the actual value of the sugar; * * * that is, the test was one made by reading by the eye. * * * Upon the passage of the act here in question the Treasury Department promulgated regulations for the use of the polariscopic test, which * * * provide that the reading must be corrected by certain arbitrary additions as prescribed in a table prepared by the officers of the government."

Although in the excerpt last above quoted the additions are called "arbitrary," the Circuit Court found (as did the Board of General Appraisers) that the preponderance of proof sustained the contention of the government that "there is a variation in the reading of the polariscope according to variations in temperature at the place where the sugar is tested; that the corrections and additions provided for by the regulations merely consist in an addition of .3 per cent. for each 10 degrees Centigrade of temperature above that at which the polariscope is standardized [viz., 17.5 degrees C.]; and that in this way the actual amount of pure sucrose in each sample is more accurately determined than was the case under the old eye test." The importers vigorously contest this proposition as to the effect of change of temperature, but evidently there is a division of scientific opinion thereon, and appellants have not made out a case strong enough to overcome the presumption that the Secretary of the Treasury, who chose the method of testing as between old and new, properly selected the one which would be likely in the greater number of cases to eliminate error. Apparently no single polariscopic test can be accepted as absolutely accurate. Under the old system there were constant differences, which were "adjusted" by striking averages. Under the new, occasionally the reading, when corrected for temperature, will indicate that the sugar is one-, two-, or three-tenths of 1 per cent. above par, which is impossible. There are some suggestions as to the cause of this apparent excessive percentage in the opinion of the board, which open up chemical questions that need not be discussed here.

The Circuit Court, although satisfied that the so-called new method of conducting the polariscopic test was on the whole more accurate than the old, nevertheless reached the conclusion that the Treasury Department was not justified in adopting it, because the term "testing

by the polariscope" had a well-settled commercial meaning at the time of the passage of the act of July 24, 1897, c. 11, § 1, Schedule E, par. 209, 30 Stat. 168 [U. S. Comp. St. 1901, p. 1647], and that the customs officers should subject sugars to such test only in the way in which dealers in sugars had been testing them for 20 years. In this conclusion we are unable to concur. There is nothing in the phrases themselves, "testing by the polariscope," or "shown by the polariscopic test," which indicates that they are peculiarly trade terms, as are "white goods," "hem-stitched handkerchiefs," "structural iron," etc. On the contrary, they seem to import that Congress intended that there should be a scientific determination as to some constituent or constituents of the sugar, for the polariscope is a scientific instrument, and, as the proof shows, has never been used by the traders themselves, but only by expert chemists whom they employ. If this be so, if Congress had in mind the making of such scientific determination, then the only question to be answered is whether the method finally adopted is best calculated to achieve the result; and it is immaterial that prior to the passage of the act the chemists employed by dealers followed some different method of conducting such test. Concededly, there are no instruments and no methods now known to science which will secure an absolutely accurate polariscopic test. Suppose, now, that some one should discover an improvement in instrument or method which would wholly eliminate every inaccuracy—even that resulting from the personal equation— and that every scientist agreed that such new way of testing by polariscope was absolutely accurate, could it be that the government would be debarred from applying such improved polariscopic test to imported sugars because it was not known to science when the act was passed? Some years ago Congress regulated a sliding scale of duties on manufactures of cotton by the number of threads to the square inch counting warp and filling. Certain cotton goods were brought in, which the importers claimed were not within the particular paragraph, on the theory that it included only goods described and classed by the trade according to the number of threads when the act was passed. The importers offered to show not only that the goods in question were excluded in trade from the group of "countable cottons," but that in trade no one ever counted threads except by the microscope (or the unaided eye), and that it was impossible to count the threads in the imported goods in any such way; unraveling alone would disclose the number. The court held, however, that such proof was immaterial, because there was "no reference in the statute, either expressly or by implication, to any commercial usage, and there is no language in it which requires for its interpretation the aid of any extrinsic circumstances." Newman v. Arthur, 109 U. S. 132, 3 Sup. Ct. 88, 27 L. Ed. 883. The same rule of construction would seem equally applicable to a chemical and to an arithmetical test.

The polariscope is an instrument of science, used in the laboratory. It is composed of many parts, varying apparently in details of structure (some are made in Germany, others in France). It requires special knowledge and experience to operate it. The conditions under which the test is conducted apparently in some slight measure modify the results indicated by the readings. All these matters of detail have to be

provided for, and Congress has not specifically provided for them in the act itself. They come naturally within the province of the Secretary of the Treasury under the general power to make regulations not inconsistent with law, granted to him by section 251, Rev. St. U. S. [U. S. Comp. St. 1901, p. 138]. It is left to him to decide whether he will supply the testers with French or with German instruments, what measure of study and experience shall qualify persons seeking employment as testers, what improvements have received a sufficiently broad acceptance by scientists to warrant their adoption, which of two methods of manipulation (if there be two) touching the relative value of which scientists may be equally divided shall be the one followed in government laboratories. So long as he acts in good faith, and it does not appear that his regulations operate to make the prescribed test less accurate than it was when Congress adopted it, the courts should not interfere with administrative details which are confided to him.

Provisions as to payment of sugar duty on polariscopic test are first found in paragraph 235, Tariff Act March 3, 1883, c. 121, Schedule E, 22 Stat. 502. Thereupon the Secretary of the Treasury prescribed regulations which are apparently like those now in force, except as to correction for temperature. These regulations, however, did not provide for taking the average of conflicting tests made by experts employed one by the government, the other by the importer, which would be in substantial conformity to the mercantile practice, where buyer and seller had each his own expert. On the contrary, these regulations of 1883 required that all the tests—two or more—should be made by government chemists, and an average of them taken. In the tariff act of 1890 (Act Oct. 1, 1890, c. 1244, 26 Stat. 567), some sugars were admitted free, others were made dutiable, but only by color standard, the provision for polariscopic test being omitted. In section 3 of that act (26 Stat. 612), however, which provided for duties on sugars coming from countries which might thereafter discriminate against the United States, such test is included; and the same is true of paragraph 231 (chapter 1244, § 1, Schedule E, 26 Stat. 583), which provided for the payment of bounties on domestic sugar. Thereafter (August 18, 1892) the Treasury Department prescribed regulations relative to the bounty on sugar, including directions for conducting the polariscope test, which were substantially the same as those now in force containing provisions for making additions to the reading of the instrument in order to correct for variance in temperature. The book containing them quotes the provisions of the tariff act of 1890 not only as to bounty, but also as to countries discriminating against the United States. It also calls attention to proclamations of the President, March 15, 1892, suspending from that date the provisions of the tariff act relating to the free introduction of sugar, and declaring the duties set forth in section 3 (which provided for polariscopic tests) to be in force as to sugar the product of or exported from Colombia, Haiti, and Venezuela. Manifestly these regulations applied not only to domestic sugars, but to such imported sugars as might come from those countries. Although it does not appear whether or not any sugars came here from such countries in 1892, 1893, or 1894, it must be assumed that Congress was fully cognizant of all the provisions of the treasury regulations, and

that its subsequent legislation was enacted with full appreciation of what those regulations contained.

As we have seen, Congress in the act of 1890 had adopted two modes of classification for duty on imported sugars—color standard, combined with polariscopic tests, for such as might come from countries discriminating against the United States; color standard only for sugars coming from all other countries. In the next tariff act (August 28, 1894) it provided for color standard alone as to sugars, and for polariscope test as to molasses. It also repealed the provisions for bounties on domestic sugars. The Secretary of the Treasury thereupon (May 13, 1895) promulgated regulations for the sampling and classification of sugars and molasses under the provisions of the tariff act of 1894, and for the polarization of sugars as an aid in determining their dutiable value. These regulations did not provide for any correction on account of variance in temperature.

Therefore, when Congress passed the tariff act now under consideration, it knew that the secretary had made regulations as to polariscopic tests; that he had varied them from time to time—presumably to secure more accurate results; that sometimes he had directed that additions to the readings should be made for changes of temperature; that at other times he had not required such additions to be made. It seems a reasonable conclusion that Congress, when it passed the act of 1897, containing merely the phrase "testing by the polariscope," without any further directions as to such test, without approval or condemnation of either of the variant methods of conducting it which the Treasury Department had theretofore prescribed for imported as well as domestic sugars, intended to leave all details as to selection of instrument, employment of experts, and instruction as to method to the sound discretion of the secretary.

The decision of the Circuit Court is reversed, and that of the Board of General Appraisers is affirmed.