# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### UNITED STATES v. LUEDER.

#### (Circuit Court of Appeals, Second Circuit. February 1, 1907.)

#### No. 126 (3,339).

1. CUSTOMS DUTIES—TREASURY REGULATIONS—POLARISCOPIC TEST.

   Under the general authority conferred by section 251, Rev. St. [U. S. Comp. St. 1901, p. 138], the Secretary of the Treasury promulgated regulations for ascertaining the polariscopic test of sugar drainings. *Held* that, where these regulations were substantially followed by the government polariscopists, the findings by those officers are conclusive.

2. SAME—SUGAR TEST—FRACTION OF DEGREE—DE MINIMIS, ETC.

   In determining whether sugar drainings should be classed under a tariff act as "not above fifty-six degrees" by the polariscope, or as "fifty-six degrees and above," *held*, that the rule of de minimis non curat lex does not apply to drainings testing 56.025, so as to require their classification under the former provision as testing 56, by disregarding the fraction of a degree.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For decision below, see (C. C.) 146 Fed. 149, affirming a decision of the Board of United States General Appraisers, which had reversed the assessment of duty by the collector of customs at the port of New York on merchandise imported by A. Lueder.

The majority and dissenting opinions of the Board of General Appraisers read as follows:

Waite, General Appraiser. The merchandise in question consists of sugar drainings, upon which duty was assessed at the rate of six cents per gallon under the provisions of paragraph 209 of the act of July 24, 1897, c. 11, § 1, 30 Stat. 168 [U. S. Comp. St. 1901, p. 1647]. The rate of duty to be assessed is determined by polariscopic test. If the test indicates more than 56° the duty should be assessed at six cents per gallon; if not, it should be assessed at three cents per gallon. The only question here is one of fact, as to what the test actually was at the time the goods were imported.

The goods were entered on February 1, 1901, and unloaded about the 19th of February. Samples were taken on the 19th, and tests made at different times from the 21st of February, 1901, to some time in 1902. The test used as the basis for assessing the duty was arrived at by averaging a number of tests, and showed 56.025°. Thus it will be seen that the reading was carried to one-fortieth of a degree. It is undisputed that drainings, after fermentation commences, show a higher reading by the polariscope, and that this in-

crease continues during fermentation, and after fermentation ceases it returns to its normal state. The evidence indicates that the tests relied upon by the government were taken after fermentation had commenced, as the tests seem to have increased for a period after samples were taken, and then fallen away again until they indicated a condition considerably below 56°. We are of opinion that the first tests taken by the government were more nearly correct than subsequent ones, and there was no occasion for taking the third test. Besides, tests made by other competent polariscopists indicate that the test relied upon was erroneous. Hence we conclude that the duty should be assessed as upon drainings showing a test of 56° or under.

The protest is therefore sustained and the collector's decision reversed, with instructions to reliquidate the entry accordingly.

De Vries, General Appraiser (dissenting). The sole question here is the true polariscopic test of certain sugar drainings. They were assessed for duty at the rate of six cents per gallon, as testing 56° and above by the polariscope, and are claimed to be dutiable at the rate of three cents per gallon, as testing not above 56° by the polariscope, under the provisions of paragraph 209 of the act of July 24, 1897 (30 Stat. 168, c. 11, § 1 [U. S. Comp. St. 1901, p. 1647]) which, in so far as pertinent, is hereinafter quoted. The undisputed facts shown by the record and testimony may be epitomized as follows:

(1) The merchandise was imported per Vala, which arrived at the port of New York January 31, 1901. This merchandise was entered for consumption February 1, 1901, and the following note made on the entry: "The within cargo damaged by water and a large quantity of molasses found and landed in 220 packages, February 18, 1901."

(2) February 21, 1901, tests were made at the government laboratory of samples of the 220 packages of drainings. The examining officer on that day took from the drainings the requisite quantity for samples, intermixed the same, and sent to the laboratory one regulation can thereof. This was divided into two parts in the laboratory and each part tested by a different expert, with the results that one part showed a polariscopic registration of 55.9° and the other 56°, with the average of 55.95° as the accepted test of that sample, all of which was duly certified to and recorded by the said examiner. On the same day the second can forwarded to the laboratory and likewise treated and tested and the results certified and recorded as 56.1°, 56.1°, average and accepted test of sample, 56.1°. The average of the two accepted tests (55.95° and 56.1°) was then taken as the true test of that sample of the drainings, and due notice thereof given to the importer.

(3) No application was made by the importer within the required two days under the provisions therefor in article 1372, Customs Regulations, 1899, providing: "Should the importer, within two official days after such notice has been sent to him by the appraiser, claim an error in the test so reported and request a retest of any mark or portion of a mark, such retest may be granted. * * *" The following article of said regulations is pertinent and provides: "1373. In case of retest, the test upon which sugar shall be classified shall be the original test unless such test is higher than the retest, in which case the retest, or the average of the test and retest, shall be taken as the basis of classification, whichever is shown to the satisfaction of the appraiser to be the correct test." On March 1, 1901, however, many days after time required, the importer filed a request in writing for a retest of the drainings in question, upon which the examiner, however, acted, and a retest was on March 2, 1901, made pursuant to the regulations with the following results: The first can tested 57° and 57.1°, average and accepted test of the can 57.05°; the second can tested 56.6° and 56.7°, average and accepted test of that can 56.65°, which was duly certified to and recorded by the examiner with the average of tests for the accepted test of the "retest" sample 56.85°. A further test was made in response to complaint of the importer on March 7, 1901, of one sample can resulting in 57° and 57°, with an average and accepted test of 57°.

Counsel for importer in his brief contends that the first can, which was but one-half of the first sample, tested at the government laboratory, resulting in 55.9° and 56°, with an average of 55.95°, was the "test" of the drainings, and

the second can, which was the other half of that sample, giving the result of 56.1° and 56.1°, with an average of 56.1°, was a "retest," and that under article 1373 of the regulations quoted the former should be accepted as the actual test. I do not concur in this view. It required both of these cans to be tested and the average of the accepted tests of each to comply with the regulations for the first test. Moreover, importer had not as yet filed his request for a "retest," and the retest in compliance therewith was subsequently made. The "retest" contemplated by the regulations (article 1373) is that made upon application of the importer as prescribed in the preceding article thereof (1372), and the test of a single can or part of a sample made by the laboratory at the instance of the examiner is not within purview of that regulation.

(3½) On November 21, 1901, a test made under the supervision of this board in the government laboratory showed a polariscopic result of 52.6°; second, 52.8°; average and accepted test, 52.7°.

(4) February 23, 1901, samples of these drainings were tested by Sherer Bros., chemists, of New York, who returned that they tested by the polariscope 54.7°, and a member of that firm testified that a very recent test of the same sample showed only 50°.

(5) February 28, 1901, samples of the drainings in question were tested by Sharples & Bennett, chemists, New York, who returned them at the polariscopic test of 53°. On March 4, 1901, a subsequent test by the same firm of the drainings was returned at 52.6°.

(6) It appears that the drainings, when examined by Mr. Sherer at least, were and had been undergoing fermentation; that that state usually lasts about 10 days; that its effect is to first raise the polariscopic test and then resume the normal, unless it continues to attack the sugar, in which case it reduces all the sugar to alcohol. It does not appear satisfactorily whether or not these drainings were undergoing fermentation at the time imported, nor when such fermentation commenced, and only by inference whether or not it ceased.

(7) It appears from the importer's witnesses that chemists are not able to read the polariscope within from .2 to 1 degree of one another, and that in molasses they sometimes vary 2 or 3 degrees in a test, and that commercially about .5 of 1 degree is allowed in both sugar and molasses test for such variations; that the government regulations are different in their requirements from the commercial tests, and Mr. Sherer stated: "If I had followed the government articles, I would probably have got my readings .3° to .4° higher than I did."

(8) Subsequent tests made by A. Weichert, April 10, 1902, showed 52°; by G. Grund and Charles F. Judd, April 11, 1902, showed tests of 54.8° and 55°, respectively. The applicable provision of law is as follows: "209. Sugars * * * concrete and concentrated molasses, testing by the polariscope; * * * molasses testing above forty degrees and not above fifty-six degrees, three cents per gallon; testing fifty-six degrees and above, six cents per gallon; sugar drainings and sugar sweepings shall be subject to duty as molasses or sugar, as the case may be, according to polariscopic test." Regulations were duly promulgated by the Secretary of the Treasury under authority of law (section 251, Rev. St. [U. S. Comp. St. 1901, p. 138]) for the enforcement of this act. Among other things they provide:

"Art. 1362. Raw or unrefined sugars not above No. 16 Dutch standard in color shall be separated by the experts in the examining room according to the marks, and the samples of each mark shall be thoroughly mixed together, reducing if necessary by quartering, until the proper amount is secured for the general sample. From such general sample two round tin sample boxes of uniform size, made to contain not less than 1 pound each, shall be closely packed full of sugar, and transmitted forthwith to the laboratory for polariscopic test. The boxes must be so made as to be practically air-tight when closed. The samples of a mark first sent to the laboratory shall be known as 'first samples,' and shall be so entered in the record of tests as hereinafter provided."

"Art. 1364. In conformity with the principles of commercial usage and in order to secure correct results in the testing of sugars for the assessment of

duty, it is directed that at least two tests shall be made of each sample of sugar sent to the laboratory and of its several products, as specified in the law, except molasses polarizing more than 2° above or below 40 or 56 degrees; and the test which shall be accepted for the classification of a mark shall be an average of tests as hereinafter provided, such averages to be carried to five places of decimals when called for by the figures.

"Art. 1365. Samples sent to the laboratory as provided in articles 1362 and 1363 shall be carefully mixed. Sugars containing hard lumps not readily crushed and mixed by hand must be mixed in a mortar or by other adequate means. After thorough mixing, the respective samples shall be divided into two equal portions, each of which shall be tested by different experts. Should the results of the two separate tests of a sample so made correspond within three-tenths of 1° the average of the two shall be accepted as the test of such sample."

"Art. 1368. The tests of the two samples of a mark first sent to the laboratory, having been duly reported, shall be permanently entered in the record of tests according to their serial numbers, respectively, together with the accepted test of each sample, determined in manner as hereinbefore provided. Should such accepted tests correspond within five-tenths of 1° the average of the two shall be taken as the true test of the sugar."

"Art. 1372. When the test of the sugar has been determined as provided in articles 1364 to 1370, both inclusive, the appraiser shall immediately notify the importer, by messenger when practicable, of such test. Should the importer, within two official days after such notice has been sent to him by the appraiser, claim an error in the test so reported and request a retest of any mark or portion of a mark, such retest may be granted, provided, on evidence furnished, such claim shall appear to the appraiser to be well founded; but in no case shall a retest be granted when the error claimed is shown to be less than four-tenths of 1°. Samples for retest shall be made up from the reserved portion of the mark and shall be treated in all respects as provided for original tests."

"Art. 1373. In case of retest, the test upon which the sugar shall be classified shall be the original test unless such test is higher than the retest, in which case the retest, or the average of the test and retest, shall be taken as the basis of classification, whichever is shown to the satisfaction of the appraiser to be the correct test."

An examination of the facts found in connection with the regulations cited shows that the examiner substantially pursued these regulations in determining the polariscopic test of the drainings in question. The one deviation, if any, was the fact that the second can of samples was sent to the laboratory after the examination of the first. Both examinations were made, however, during the same day, and the samples were intermixed before being placed in the can, and two examinations of each sample were made in the laboratory and the averages duly made as prescribed by the regulations. The importer urges two contentions in support of his protest: First, that the polariscopic test by the government official is high, and that the polariscopic tests made by the importer's chemists show a lower degree; and, second, that the degree of the test above 56° returned by the government experts is so small that the actual polariscopic test becomes a matter of doubt, which doubt should be resolved in favor of the importer. I fail to see how the evidence in this record tends to the establishment of the claim that the test found by the government officials is erroneous, or indeed involved in doubt. I do not believe it is within the discretion of the examining officials, under the regulations of the department, to disregard a fractional registry above 56° in such cases. Not, at least, unless error in reading is clearly established. An applicable provision of law similar in principle has been construed by this board in G. A. 1795 (T. D. 13,483). In that case the statute the subject of construction was paragraph 353 of the act of 1890, which levied duty on "stockings, hose, etc., valued at more than sixty cents per dozen pairs and not more than two dollars per dozen pairs," etc. The valuation placed upon them was 60 cents and a quarter of a mill per dozen pairs. The importers contended that this small fraction of a mill was so insignificant that it ought not to enter into the computation of values. The board said: "There are cases where the law disregards the

fractional part of a day in computing time, but the principle upon which such cases rests has no application to computations of value; nor does the maxim 'De minimis lex non curat' apply, in our judgment. The language of the paragraph in question is 'more than sixty cents,' and on reflection we can perceive no reason why a fraction of a cent in value over a specific sum should not be construed to mean more than such sum." Moreover, it appears from the reading of the regulations that fractions of a polariscopic registration even to the ten-thousandths of a degree shall be regarded. The latter part of article 1364 reads: "Art. 1364. * * * And the test which shall be accepted for the classification of a marking shall be an average of tests as hereinafter provided; such averages to be carried to 5 places of decimals when called for by the figures." In my judgment, the unmistakable intent of that provision of the regulations is that in determining the polariscopic test and what is more than 56° polariscopic test, the calculations shall be carried to 5 decimal places; and evidently, when that calculation shall, within the radius of 5 decimal places, produce a fraction which reads above 56°, it shall be observed by the examining officers and become the accepted test. In the case at hand the calculations showed that at the second decimal figure a fraction was present above 56°. I do not see how, in the presence of such a regulation, we are at liberty to disregard the fractional part of the test which comes plainly within the purport and intent of the applicable and unimpeached regulations. It must be borne in mind the duty of impeaching the return of the collector is upon the importer, upon whom rests the burden of proof in the case. The evidence offered by the protestant is in every wise reconcilable with the correctness of the government test, and hence does not disprove it. It would seem from the facts found and the record that the polariscopic test of drainings varies from time to time. Particularly is this true where fermentation has set in. But there is nothing in the record which shows when fermentation set in, and when it ceased. The rate of duty levied upon sugar drainings is a specific rate. The condition of the drainings for assessment purposes in such cases is the condition in which they were when imported.

It appears from the record that the vessel arrived at the port of New York on January 31, 1901, that the merchandise was unloaded February 18, 1901, and that the first test by the government officials was made on February 21, 1901. Evidently this was as soon as practicable after importation. It will be noted also that this test was the most proximate one to the date of the actual importation of the merchandise; that the next proximate test was that made by Mr. Sherer—a recognized and competent chemist of experience in determining polariscopic tests of sugar and drainings—on February 23, 1901, which showed 54.7°. This is the most exact evidence, and to my mind the most reliable offered in disproof of the correctness of the tests by the government officials. It was made two days after the government tests and from a different sample. The other tests by the importer were many days subsequent. The degree of thoroughness of that test is not shown by the record. It resulted, however, in a difference of 1.325° from the accepted test of the government by the standard of which the drainings in question were assessed. Mr. Sherer, however, testified (and he was a witness for the importer) that chemists were not able to read the polariscope within 1° to 2° of one another. He further testified that his method of testing such differed from the government's method, and that had he tested the drainings in accordance with the regulations of the government his test would have shown three or four tenths of a degree higher. I do not think this is sufficient evidence, or evidence which, to any material extent, rebuts the return of the government examiner as to the correct test of the drainings in question. The examiner returns 56.025°. Mr. Sherer returns 1.325° less than this. He testifies that had he pursued the government's regulations his test would have been three to four tenths of a degree higher, and that different chemists will read the polariscope from 1 to 2 degrees differently.

In my judgment this does not establish that the government test was erroneous. On the contrary, its absolute correctness is perfectly harmonious with this return, under the testimony of Mr. Sherer. Indeed, his testimony, to my mind, rather conduces to the correctness of the government's test. For, if it be true that different chemists will read the polariscope from 1° to 2°

in sugar and 3° in molasses differently, we could no more say that Mr. Sherer was right than that the government was right, and that the tests made by two different persons differ to the extent of 1.325° no more than establishes Mr. Sherer's proposition to wit, that different persons read the polariscope differently, and one is as likely to be correct as the other. The burden being upon the importer to disprove the correctness of the government return, this evidence, in my opinion, fails to do so. But, two experts have read the polariscope and averaged their results in order to establish the government's test, while there is no evidence in the record of such proof of dual calculation on the part of Mr. Sherer; and it is, therefore, more probable that the government test, which is the average of the reading of two experts, be true than that of Mr. Sherer alone. At most, it only establishes the proposition that different chemists, by reason of visual differences, read the polariscope differently. It may be accepted as true and still be perfectly consistent with the government's test being absolutely accurate. In my judgment, the force of the testimony of Messrs. Weichert, Grund, and Judd is subject to the same considerations. The examinations were made from the same sample within one day of each other, and returns made of 52°, 54.8°, and 55°, at a time almost three months after the importation of the goods. Under the testimony given they are perfectly reconcilable with the correctness of the government return and in no wise disprove it.

It is equally important in the determination of tariff duties by any test, such as the polariscopic test, to have the various tests made uniform as well as exact. To establish a uniformity in the reading of the tests of sugar by the various experts at the different ports in the United States, the government regulations provide for a constant interchange of tests of the same materials in order that they may compare one with the other, their accuracy and uniformity of readings, and that duties may be uniformly levied at the different ports. See Customs Regulations, 1899 (articles 1382 to 1386, inclusive). It is of equal importance to have the tests made of the various importations at the same port uniform a well as exact. Granting that the government's expert's readings may be different from that of some other expert, if all of the tests are made by the same expert there is uniformity of results and of duties levied. If, however, the test to be arrived at is in one case determined by taking the average of the tests made by the government's experts and the test made by some chemist not in the government service, introduced to raise a doubt as to the accuracy of the government's return, as is here done, and the duties levied upon another cargo in another case are to be levied at a rate determined by a test made by the government chemists averaged with a test of another or second chemist not in the government employ introduced for the same purpose, the uniformity of tests and of duties upon sugar at that port, as well as other ports, would at once be destroyed. This must be admittedly true where there is a visual difference in readings.

I think that where a law is enacted providing that the rate of duty on sugar shall be governed by a mechanical, to wit, polariscopic test, and Congress has committed to the Treasury Department the power to make regulations to govern the same, and that department to that end has promulgated regulations and has therein confided to two or more examiners at each port the determination of this test, uniformity and accuracy are as nearly secured as practicable. And while it may be true, as in this case, some hardship may be wrought in specific instances, I do not feel justified in subscribing to a principle which in my judgment will become authority in future cases which may result in admitting to any port sugar the test of which for dutiable purposes has been made other than in a substantial pursuance of government regulations.

The regulations provide for the ascertainment of the polariscopic test by two government experts conducting a series of tests calculated to arrive at proximate accuracy. These have been pursued. To say that the tests of other experts shall be held to establish a doubt and to that end be made the subject of average with the government tests introduces new experts into the government service, practically appoints others than the duly appointed officers for that purpose, disregards the findings of those officials charged with that duty, and recognizes methods of procedure in determining tests that are admittedly

at variance with those only prescribed. Certainly a license of such procedure would entirely destroy any uniformity of tests and greatly jeopardize if not destroy their accuracy. Whenever this is done, it seems to me it will be a pro tanto deviation from the rules and regulations laid down by the duly authorized authority for that purpose, and pro tanto establishing a test or average of tests which are without and beyond these regulations. Such procedure should not be indulged in any case of mere doubt at least, but only in cases, if at all, of clearly erroneous findings on the part of the government officials. This would seem to be particularly true where opportunity is given by the regulations (article 1372) for reviewing the findings of the examiner, and which opportunity has been exercised by the importer with results that confirm the correctness of the test returned by the examiner. For these reasons I am constrained to dissent from the conclusions reached by my colleagues herein.

J. Osgood Nichols, Asst. U. S. Atty.
William J. Gibson, for the importer.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

PER CURIAM. The merchandise in question consists of "sugar drainings." It is the molasses that oozes from bags and other packages of sugar while in transit on shipboard, and which is gathered up and subsequently used for manufacturing alcohol, etc. The relevant paragraph is:

"209. Sugars * * * testing by the polariscope not above seventy-five degrees, ninety-five one-hundredths of one cent per pound and for every additional degree shown by the polariscopic test thirty-five one-thousandths of one cent per pound additional and fractions of a degree in proportion; * * * molasses testing above forty degrees and not above fifty-six degrees three cents per gallon: testing fifty-six degrees and above, six cents per gallon; sugar drainings and sugar sweepings shall be subject to duty as molasses or sugar, as the case may be, according to polariscopic test. * * *"

The present controversy is whether the importation was shown by polariscopic test to be "not above fifty-six degrees" or to be "fifty-six degrees and above." The board and the Circuit Court both found that it was below 56. Their opinions indicate that this conclusion was in part induced by a consideration of tests made by polariscopists other than those employed by the government to make the official tests. Suggestion is made that fermentation had set in when the first tests were made, but there is nothing in the record to show when it set in or when it ceased. And, whatever be the fact as to this, the condition of drainings for assessment purposes is the condition in which they were when imported, and the official test was nearer in time to the date of importation than was any subsequent test. There is no controversy as to the fundamental facts—the observed facts as distinguished from inferred facts—and they are set forth with great fullness in the dissenting opinion of General Appraiser De Vries, which also contains all relevant quotations from the treasury regulations governing the method of conducting polariscopic tests. This opinion, although written two years before, is fully in accord with the decision of this court in United States v. Bartram Bros., 131 Fed. 833, 65 C. C. A. 557, and it seems unnecessary to do more than express our concurrence with the dissentient General Appraiser in disposing of this appeal.

As was pointed out in the Bartram Case, Congress left it to the

Secretary of the Treasury to provide by appropriate regulations for the taking of tests by polariscope. The evidence in that case showed that the test was of so delicate a character that there were such sources of error, such differences of result when the same sample was tested or the same readings taken by different individuals; that it was essential to have some well-settled method, which, while not always absolutely accurate, should be at least uniform in its application. Briefly stated the method prescribed is to send to the laboratory two samples of each mark in two separate sample boxes, and at least two tests are required to be made of each sample. The respective samples are divided into two equal portions, which shall be tested by different experts, and the results averaged according to a carefully prescribed method. The tests of the two samples of a mark first sent to the laboratory, when they correspond within five-tenths of a degree, are accepted and their average taken as the true test of the sugar. Provision is made for a retest upon the importer's application.

An examination of the record shows that the dissenting General Appraiser is entirely correct in the statement that the regulations were substantially followed in determining the polariscopic test of the drainings in question and that "the one deviation, if any, was the fact that the second can of samples was sent to the laboratory after the examination of the first. Both [sets of samples were taken, prepared, and put in the two sample cans and both] examinations were made during the same day, and the samples were intermixed before being placed in the can, and two examinations of each sample were made in the laboratory, and the average duly made as prescribed by the regulations." The first can was divided into two portions, each part tested by a different expert, with the result that one part showed 55.9° and the other 56°, giving 55.95° as the accepted test of that sample. The second can, similarly tested, showed 56.1° for each portion and, of course, 56.1° for the accepted test of that sample. The average of the tests of the contents of the two sample boxes, thus taken at the same time and examined on the same day (such tests corresponding within five-tenths of a degree, article 1368), was properly taken as the "true test" of the molasses. And a subsequent retest made at the request of the importer showed a higher percentage. The average of the four readings on test of the two sample boxes first sent to the laboratory was 56.025. The importer contends that this should not be considered as "56° and above" because the fraction is so small, on the theory de minimis non curat lex. We do not assent to this proposition, the statute itself refers to fractions of a degree, and the Treasury regulations (article 1364) provide that averages shall be carried to 5 places of decimals when called for by the figures.

The decision of the Circuit Court is reversed.